The bill is against the heirs-at-law of Catherine J. Simms, to specifically enforce her alleged oral contract to leave her home in Kearny to the two complainants at her death, in consideration that they would stay with and take care of her.
Mrs. Simms took the complainant Scott from a home, out of charity, at the request of a priest, in 1909, when he was nine years of age. After Mrs. Simms was widowed in 1918 she took in boys, wards of the state, for pay. Gordon, the other complainant, was one of them; he was ten years old when he was assigned to her in 1919, and she drew her reward from the state until he was fourteen — though she put him to work when he was twelve, at $2 a week, and got his pay. Scott stayed with Mrs. Simms until he married, in 1925, when he went to his wife's home, nearby, to live. Gordon remained until Mrs. Simms died in June, 1931. Scott, until he married, and Gordon, until she died, gave *Page 216 
Mrs. Simms all or nearly all of their wages, and, after he married, Scott paid the taxes on her home, $100 annually. She was a "near" old lady; she ran a small penny candy shop, and if they gave her all they say they did (Scott $70 to $90 a week from the time he was twenty-one, and Gordon $25 a week the last four years of her life), the evidence is not to be found in her bank account of $2,250.82. That they handed over their wages, but not as much as they say, is believable. Mrs. Simms was fond of them and they were filially dutiful — they knew no other mother. She intended that they should inherit what she had, not only the home, but all she had left; as to that there can be no question. A week before she died she asked a neighbor to arrange with a lawyer, and another to act as a witness, for the drawing of her will and she told them that all was to be left to the two complainants, and, in preparation for the appointment with the lawyer for the following Monday, she gave Scott the deed to the house and her bank book to take along. She delayed too long.
The testimony of the complainants' witnesses, of pertinent conversation with Mrs. Simms, may be resolved into expressions of testamentary purpose, and is of little or no support to prove a contract to devise the homestead, and after a thoughtful analysis of the complainants' testimony, we are constrained to hold that the proofs do not clearly and convincingly establish a contract capable of definite ascertainment, and we are of the opinion that what Mrs. Simms said to the complainants expressed to them a testamentary intention and no more. Scott says "after her husband died; [1918] she told me if I take care of the place and see to her, that the property would be left to me." These are words of contract. Gordon says, in 1925 "she said to me, `John,' she said, `you work and stay here' and she says `this house is yours when I die.'" These are also words of contract, but lose that meaning, and the testimony suffers much in value as proof of a contract with either Scott or Gordon, for Gordon adds, under prompting from counsel, that Scott was present and that "she [Mrs. Simms] said it would be divided between *Page 217 
John Scott and I." Now, if Scott had a contract with Mrs. Simms in 1918, before Gordon came on the scene, that the house was to be left to him if he stayed and took care of her, we would naturally expect a vigorous protest from Scott against a contract with Gordon or one jointly with him seven years later. And Scott seems not to have regarded Mrs. Simms as having made a contract with him in 1918, for he says that two days before she died, when she gave him her deed and bank book to take to the lawyer: "She said the property would be left to us two if we took good care of her and we had been taking care of her for many years. She said: `Never regret what you do for me. The property will be for you. As long as you see things right and do right.'" The fact that Mrs. Simms successively "promised" to leave the house to Scott and then to Gordon, or to both of them, predicates testamentary intention and not contract. We perceive nothing in the testimony other than an intention, frequently expressed by Mrs. Simms, to leave her estate to the complainants; and this we find was Gordon's understanding, for, when asked if she said she would will the house to them, he answered: "She had intentions of willing the house to us." And it is a fair deduction from Scott's conduct in conceding to Gordon the right to participate, that he understood Mrs. Simms promised bounty, which misfortune thwarted. Intention to will and a contract to will are far different things.
It is understandable how these victims of fate convince themselves that they had a contract with Mrs. Simms, and how Gordon is unmindful that he had but a claim to her bounty, for he testified that his arrangement with her, when she took him in, was that he was to work for her until he was twenty-one; and he was just past that age at her death. Honors are easy as between the care she gave them in infancy and their earnings they gave her later on. Conscience offers feeble resistance to self interest; that is why the law, in circumstances like the present, exacts positive proof, and why the courts scan with scrupulous care and are reluctant *Page 218 
to act upon the unsupported evidence of claimants to a decedent's estate. Berg v. Baldwin, 84 N.J. Eq. 90.
We conclude that it was the understanding of the complainants and of the deceased as of the time, after 1925, after Scott married, when Mrs. Simms in the presence of Scott said to Gordon: "You stay here and work and take care of this house, and after I die the house, the property is yours," and as Gordon says: "It was supposed to be divided between the two of us," that Mrs. Simms meant bounty and not contract. If there was a contract with Scott seven years before and if, as Gordon now claims, it meant contract with him, and not bounty to both, why was it that Scott did not assert his supposed exclusive contract of 1918?
The proof falls short of establishing a contract and the bill will be dismissed.